IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

WESTERN STAR HOSPITAL AUTHORITY
INC., D/B/A METRO HEALTH EMS,

    Plaintiff,

v.                                  Case No. 3:18-CV-00647

CITY OF RICHMOND AND RICHMOND
AMBULANCE AUTHORITY,

    Defendants.

## REPLY BRIEF IN SUPPORT OF RAA'S MOTION TO DISMISS

## I.      INTRODUCTION

Western Star Hospital Authority, Inc. d/b/a Metro Health EMS ("Metro") submitted a bid in response to a Request for Quotes ("RFQ") from the Hunter Holmes McGuire Veteran's Administration Medical Center ("VA Medical Center"). The RFQ required that "before award of contract, the Service Provider must provide an official City Franchise Permit required to operate patient transport services in the City of Richmond" ("City"). Nevertheless, Metro alleges that the City and Richmond Ambulance Authority ("RAA") violated the Sherman Act through the monopolization or attempted monopolization of EMS vehicle services, violated Metro's constitutional rights, and tortiously interfered with Metro's alleged contract with the VA Medical Center.

The City and RAA are immune from Metro's antitrust claims pursuant to the state-action immunity doctrine. RAA provides EMS vehicle services in the City pursuant to a validly-issued franchise from the City, as authorized by the Code of Virginia. The authorizing statute clearly articulates a state policy to displace competition. Neither the City nor RAA requires active

supervision by the Commonwealth to enjoy the benefits of state-action immunity and, even if there were a market participant exception, it would not apply under the facts of this case.

Moreover, there is no contract between the VA Medical Center and Metro, nor is there a legitimate expectation of a contract. The facts alleged reveal only a purportedly accepted bid that cannot rise to the level of a contract because Metro is unable to satisfy a prerequisite to the award of a contract. As such, Metro has not stated a claim for either a Constitutional violation or interference with contract. The Second Amended Complaint against RAA should be dismissed with prejudice.

## II.     ARGUMENT

### A.     Metro does not state a claim against RAA for monopolization or attempted monopolization.

#### 1.     If state-action immunity applies to the City, RAA is also immune.

Metro does not dispute the established rule that if state-action immunity applies to the anticompetitive conduct of a municipality, the beneficiary of that conduct is also immune, even if the beneficiary sought to influence the municipality for anticompetitive purposes. This rule is rooted in the First Amendment, *see Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 398 (4th Cir. 2001) ("The *Noerr-Pennington* doctrine guarantees citizens their First Amendment right to petition the government for redress without fear of antitrust liability"); *Forest Ambulance Serv., Inc. v. Mercy Ambulance of Richmond, Inc.*, 952 F. Supp. 296, 302 (E.D. Va. 1997) ("The *Noerr–Pennington* doctrine is a corollary to [state-action] immunity."), and in logic, *see Cine 42nd St. Theater Corp. v. Nederlander Org., Inc.*, 790 F.2d 1032, 1047–48 (2d Cir. 1986) ("Since the UDC's actions are shielded from antitrust law violations, it would defeat the purpose of the defense were we to allow appellants to prevent the award designations simply by suing New York City rather than the Agency"); *AmeriCare MedServices, Inc. v. City of Anaheim*, No. 816-cv-1703, 2017 WL 5592892, *2 (C.D. Cal. Apr. 21, 2017) ("[W]here a private company's monopoly arises from state

authorization of anticompetitive conduct, [state-action] immunity extends to the private company as well"), *aff'd*, 735 F. App'x 473 (9th Cir. 2018).

That rule is pertinent here, because Metro's antitrust claims arise out of the City's allegedly unlawful exercise of its powers under Virginia Code section 32.1-111.14, which Metro alleges has eliminated competition for non-emergency EMS vehicle transport services in Richmond, resulting in a monopoly for RAA. (*See* ECF Doc. 35, at 1.)

Notwithstanding the established rule, Metro focuses much of its state-action immunity analysis on RAA, not the City. (*See* ECF Doc. 69, at 20-22.) As a matter of law, however, the decision to award (or not award) a permit is solely within the City's authority. *See* Va. Code § 32.1-111.14(A). If RAA enjoys a monopoly, it is the direct result of the City's exercise of its authority. Consequently, if state action immunity applies to the City, RAA is also immune. The result is the same even if, as Metro contends, "RAA was intimately involved in the decision to prevent Metro Health from performing its awarded contract and it is the direct beneficiary of the decision." (ECF Doc. 69, at 27.) *See also Baltimore Scrap*, 237 F.3d at 398 ("[T]he Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly") (quoting *Noerr*, 365 U.S. at 136).

2.    **The alleged anticompetitive conduct is the foreseeable result of the exercise of powers granted to the City by the General Assembly.**

RAA agrees that the City is a non-sovereign entity[1] and, therefore, to establish state-action immunity, it must show that the alleged anticompetitive conduct was undertaken pursuant to "a

---

[1] In the state-action immunity context, sovereign entity means the state's legislature or its highest court of appeals acting in a legislative capacity, and non-sovereign entity means any entity other than sovereigns. Sovereign entities are *ipso facto* immune from antitrust liability under the Sherman Act. *Accord Edinboro Coll. Park Apartments v. Edinboro Univ. Found.*, 850 F.3d 567, 572 (3d Cir. 2017).

clearly articulated state policy to displace competition." *Airport Properties Ltd. P'ship v. Capital Region Airport Comm'n*, 929 F.2d 691 (4th Cir. 1991). Metro's analysis of the clear articulation test misconstrues the holding in *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216 (2013), and misstates the effect of that holding on this Court's precedent analyzing Virginia Code section 32.1-111.14. In *Forest Ambulance*, this Court utilized the same foreseeability standard articulated in *Phoebe*, and applied that standard consistent with the Supreme Court's application in *Phoebe*. Furthermore, this Court correctly concluded that section 32.1-111.14 contemplates the same anticompetitive conduct and effect that forms the basis for Metro's Amended Complaint. Therefore, the clear articulation test is satisfied.

In *Forest Ambulance*, this Court held that the alleged monopolization of non-emergency ambulance services in the Richmond market was the foreseeable result of a clearly articulated state policy to displace competition in that market. *Forest Ambulance*, 952 F. Supp. at 300. Metro contends that *Forest Ambulance* is no longer good law because the Court utilized an "out-of-date" foreseeability standard in determining that the City acted pursuant to a clearly articulated state policy to displace competition. (ECF Doc. 69, at 12.) According to Metro, the Supreme Court "revised" the foreseeability standard in *Phoebe*. (*Id.*) *Forest Ambulance* utilized the following foreseeability standard:

> Although municipalities are not automatically immune, they enjoy immunity when acting pursuant to a "clear articulation of a state policy to authorize anticompetitive conduct." *Hallie v. Eau Claire*, 471 U.S. 34, 40, 105 S. Ct. 1713, 1717, 85 L.Ed.2d 24 (1985) (internal quotations and citations omitted). To receive immunity, a municipality must show that anticompetitive activity was a "foreseeable result" of the state legislature's grant of authority. *Hallie*, 471 U.S. at 42, 105 S. Ct. at 1718.

*Forest Ambulance*, 952 F. Supp. at 299. This is the same standard the Supreme Court used in *Phoebe*:

> "[T]o pass the 'clear articulation' test," a state legislature need not "expressly state in

> a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects." [*Hallie v. Eau Claire*, 471 U.S. 34, 43, 105 S. Ct. 1713 (1985)]. Rather, we explained in *Hallie* that state-action immunity applies if the anticompetitive effect was the "foreseeable result" of what the State authorized. *Id.*, at 42, 105 S. Ct. 1713.

*Phoebe*, 568 U.S. at 226–27.

The Supreme Court did not revise the foreseeability standard in *Phoebe*, as Metro suggests. To the contrary, the Supreme Court expressly acknowledged in *Phoebe* that *Community Communications Co. v. Boulder*, 455 U.S. 40 (1982), its precedent of more than 20 years, controlled the decision. *See Phoebe*, 568 U.S. at 228. *Phoebe* merely held that the district court and court of appeals misapplied the existing standard. *See id.* at 229.

Furthermore, *Forest Ambulance* applied the foreseeability standard consistent with *Phoebe*. In *Phoebe*, the Georgia state legislature authorized municipalities to form hospital authorities and granted the authorities "general corporate powers," including the power to acquire "projects" such as hospitals, health care facilities, and other public health facilities. *Id.* at 232. When one hospital authority attempted to use its acquisition powers to monopolize acute-care hospital services, the Federal Trade Commission and the state of Georgia intervened. *Id.* at 222. Both the district court and the Eleventh Circuit held that state action immunity applied, but the Supreme Court reversed, refusing to infer authorization to engage in anticompetitive conduct simply because the state conferred general corporate powers. *Id.* at 228 ("[A] [s]tate that has delegated such general powers can hardly be said to have contemplated that they will be used anticompetitively") (internal quotations omitted). General corporate powers, including the power to acquire hospitals, are not "inherently anticompetitive;" thus, displacing competition for hospital services was not the foreseeable result of the power to acquire hospitals. *Id.* at 228, 230 ("Our case law makes clear that state-law authority to act is insufficient to establish state-action immunity; the substate governmental

entity must also show that it has been delegated authority to act or regulate anticompetitively.") (citations omitted).

In contrast to the general corporate powers addressed in *Phoebe*, here the General Assembly has expressly authorized cities to make it illegal to operate an EMS vehicle without a permit or franchise from the city; to limit the number of EMS vehicle that can operate within the city; to limit the area in which permitted EMS vehicles can operate within the city; and to fix the charges for providing EMS vehicle services within the city. *See* Va. Code § 32.1-111.14(A)(3), (4), (5). When exercised, these powers necessarily displace competition, as this Court observed in *Forest Ambulance*. *See Forest Ambulance*, 952 F. Supp. at 300 ("Subsections one through five—three, four, and five in particular—expressly authorize anticompetitive conduct"). Thus, unlike the general corporate powers in *Phoebe*, the displacement of competition is the inherent, logical, and ordinary result of the City's exercise of powers delegated to cities by the General Assembly in section 32.1-111.14.[2]

*Forest Ambulance* is also consistent with *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365 (1991), which the *Phoebe* court cited as an example of proper application of the clear articulation standard. *See Phoebe*, 568 U.S. at 230. In *Omni*, a jury found that a billboard company and the City of Columbia, South Carolina, violated the Sherman Act by conspiring to exercise the city's authority, granted by the state legislature, to regulate the size, location and spacing of billboards

---

[2] *Forest Ambulance* is also consistent with *Community Communications Co. v. Boulder*, 455 U.S. 40 (1982), the case that controlled the decision in *Phoebe Putney*. In *Boulder*, the Supreme Court held that the grant of generic "home rule" authority from the state to cities did not reflect a clearly articulated state policy to displace competition. "Acceptance of such a proposition—that the general grant of power to enact ordinances necessarily implies state authorization to enact specific anticompetitive ordinances—would wholly eviscerate the concepts of 'clear articulation and affirmative expression' that our precedents require." 455 U.S. at 56. Thus, *Phoebe Putney* and *Boulder* are both distinguishable from *Forest Ambulance* and this case, which involve a grant of authority from the state to exercise regulatory conduct that is expressly anticompetitive. *See Forest Ambulance*, 952 F. Supp. at 300.

to suppress competition from newcomers to the billboard market, including the plaintiff.  The Supreme Court held that the defendants were immune under the state-action doctrine, because they acted pursuant to a clearly articulated policy to authorize anticompetitive conduct.  *Id.* at 373.  "The very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition, particularly on the part of new entrants."  *Id.* at 373.  Likewise, the very purpose of authorizing cities to prohibit EMS vehicle services without a city permit or franchise; to limit the number of EMS vehicles; to limit where in the city permitted EMS vehicles can operate; to set the price for permitted EMS vehicle services; and to allow cities to provide EMS vehicle services themselves is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition.

Of course, authorization from the state to act anticompetively in some respects is not authorization to act anticompetively in all respects.  In *Phoebe*, for example, the state contemplated the displacement of competition for transactions requiring the issuance of certificates of need.  However, this did not establish that the state's conferral of the authority to exercise general corporate powers authorized the displacement of competition through mergers and acquisitions.  *See Phoebe*, 568 U.S. at 235.  Metro argues that the General Assembly only authorized cities to regulate EMS vehicle services operating in emergency situations, not in non-emergency situations.  (*See* ECF Doc. 69, at 14, 16.)  Metro relies on the preamble to Virginia Code section 32.1-111.14, which provides, in pertinent part, that a city may exercise its powers to regulate EMS vehicles "[u]pon finding as fact, after notice and public hearing, that exercise of the powers enumerated below is necessary to assure the provision of adequate and continuing emergency medical services . . . ."  Va. Code § 32.1-111.14(A).

Metro's interpretation isolates the preamble from the context in which it appears, contrary to a fundamental canon of statutory construction. *See Schilling v. Schmidt Baking Co., Inc.*, 876 F.3d 596, 601 (4th Cir. 2017) ("Our analysis of particular statutory language also is informed by the specific context in which that language is used, and the broader context of the statute as a whole") (internal quotations omitted). Whereas the preamble speaks of ensuring adequate emergency medical services, the body of the statute grants cities regulatory powers without regard to the circumstances in which an EMS vehicle is operated. *See Forest Ambulance*, 952 F. Supp. at 300 ("Notwithstanding the inclusion of the term 'emergency' in the name of the vehicles subject to regulation, the statutes clearly authorize regulation of those vehicles regardless of the use to which they are put. It is the vehicle, rather than the use, which is being regulated").[3] Read in conjunction with the entire statute, as required, the preamble reflects the General Assembly's recognition of the interconnectivity between emergency and non-emergency EMS vehicle services, as this Court acknowledged in *Forest Ambulance*:

> **Because at least part of the state legislature's concern was that private ambulance companies would "cherry pick" the more lucrative non-emergency services, it authorized localities to monopolize all ambulance services and take advantage of the opportunity to recoup some costs they might incur subsidizing non-lucrative emergency services . . .**

> This explains why the preamble to § 32.1–111.14 only refers to assuring the provision of adequate and continuing emergency services. There was no problem with the provision of non-emergency services. **This is why the failure of the preamble to address non-emergency service does not help the plaintiffs' case.**

*Id.* at 300, 300 n.1 (emphasis added). The General Assembly recognized that allowing cities to limit

---

[3] *See also A-1 Ambulance Serv., Inc. v. Cty. of Monterey*, 90 F.3d 333, 336 (9th Cir. 1996), *as amended on denial of reh'g and reh'g en banc* (July 31, 1996) (rejecting argument that state intended to provide state-action antitrust immunity for the creation of exclusive operating areas for providers of advance life support ambulance services in emergencies but not in non-emergency interfacility transfers where the statute referred to advance life support providers generally).

the operation of EMS vehicles, even when they are operated in non-emergency interfacility transfers, helps ensure the adequate provision of emergency EMS vehicle services.

Retreating from the preamble, Metro suggests that the City's authority to regulate EMS vehicles operating in non-emergency circumstances is ultimately "irrelevant," because Metro's antitrust complaint is not based on limiting the number of EMS vehicles operating in the City, but the elimination of competition "without regard to any number of vehicles." (ECF Doc. 69, at 15-16.) Metro's argument is a red herring.  The authority to limit the number of EMS vehicles is demonstrative of the Commonwealth's contemplation of anticompetitive conduct, but it is not alone. The General Assembly also conferred the power to require and grant permits, and it is the combination of these powers—to require a permit, to issue a permit and to limit the number of EMS vehicles—that Metro contends has unlawfully created RAA's alleged monopoly.

Metro also contends the City exceeded its authority, because, according to Metro, authorizing cities to limit the number of EMS vehicles allowed to operate within the city "is a far cry from an authorization to monopolize the non-emergency transport market." (ECF Doc. 69, at 16.)  Again, Metro fails to acknowledge the breadth of anticompetitive regulatory powers granted cities under section 32.1-111.14.  Moreover, Metro misstates the clear articulation test, which does not require the statute to catalogue explicitly all anticompetitive effects contemplated by the state legislature.  *See Phoebe*, 568 U.S. at 226 ("To pass the clear articulation test, a state legislature need not expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects") (internal quotations omitted).  The test is more "practical," requiring only that the state-conferred regulatory powers be inherently anticompetitive, and that the anticompetitive effect complained of be a foreseeable result of the exercise of those powers. *See id.* at 226–27.

9

The Commonwealth has authorized cities to require permits or franchises to operate EMS vehicles; to issue said permits and franchises; and to limit the number EMS vehicles that can operate within the City.  Elimination of competition is the foreseeable effect of exercising these powers.  *Cf. Preferred Commc'ns, Inc. v. City of Los Angeles, Cal.*, 754 F.2d 1396, 1412-13 (9th Cir. 1985), *aff'd and remanded sub nom. City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488 (1986) (holding that a city's determination to eliminate competition among cable operators by limiting the number of franchises it issues was the foreseeable result of empowering cities to issue franchises).

Metro's final argument against clear articulation is that as "an agent of the federal government," section 32.1-111.2 exempts Metro from having to obtain a permit from the City. (ECF Doc. 69, at 19.)  Section 32.1-111.2 states that "[e]mergency medical services agencies **operated by the United States government**" are exempt from the provisions of Article 2.1, Chapter 4 of Title 32.1.  *See* Va. Code § 32.1-111.2(2) (emphasis added).  Metro does not cite any authority for its proposition that a private EMS agency that contracts with the federal government is thereby operated by the federal government.  The mere fact that the VA Medical Center's RFQ explicitly requires a service provider to obtain a franchise or permit in compliance with the City's ordinance before the award of a contract belies Metro's assertion that it is exempt from the permitting requirements.

### 3.    Active supervision is not required.

Metro's active supervision analysis is flawed in part because it focuses on RAA.  (*See* ECF Doc. 69, at 20-22.)  As noted, however, RAA is the alleged beneficiary of the City's allegedly unlawful exercise of its regulatory powers.  (*See* ECF Doc. 49, at 1.)  Consequently, if the City is not required to show active supervision, neither is RAA.  *See Edinboro Coll. Park Apartments v. Edinboro Univ. Found.*, 850 F.3d 567, 574 (3d Cir. 2017) (observing that active supervision requirement does not apply to a private entity that "does not act on its own and is merely an adjunct

to a government's anticompetitive action").  Furthermore, Metro's assertion that the active state supervision requirement applies to the City is based on a misguided attempt to extend *N.C. State Board of Dental Examiners v. F.T.C.*, 135 S. Ct. 1101 (2015).

"The active supervision requirement stems from the recognition that where a **private** party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State."  *Patrick v. Burget*, 486 U.S. 94, 100 (1988) (internal quotations omitted).  It demands that "state officials have and exercise power to review particular anticompetitive acts of **private** parties and disapprove those that fail to accord with state policy."  *N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. at 1112 (emphasis added and quotations omitted).  For example, where a state statute requires licensed wine sellers to sell at prices set by private producers, the state must actively supervise the program to ensure that private producers are achieving the state's goals, and not simply advancing their own private economic interests. *See C.A. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 106-07 (1980); *see also N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. at 1112 ("The second *Midcal* requirement—active supervision—seeks to avoid [private self-dealing] by requiring the State to review and approve interstitial policies made by the entity claiming immunity").  Thus, the active supervision requirement is reserved for private parties and, as the Supreme Court confirmed in *N.C. State Board of Dental Examiners*, state agencies that are functionally private because they are controlled by private parties active in the market regulated by the agency.  *See N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. at 1113-14 ("The lesson is clear: *Midcal's* active supervision test is an essential prerequisite of *Parker* immunity for any nonsovereign entity—public or private—controlled by active market participants").  The City and RAA are not controlled by private parties actively participating in Richmond's market for EMS vehicle services; therefore, no active supervision is required in the

present case.

Municipalities like the City are public entities not subject to the active supervision requirement. *See Hallie v. City of Eau Claire*, 471 U.S. 34, 46 (1985); *accord Phoebe*, 568 U.S at 226 (citing *Hallie*). Metro contends that *N.C. State Board of Dental Examiners* modified this established rule to require active supervision where the municipality "is acting as a market participant through its corporate subsidiary" and therefore "has an incentive to pursue its own self-interest under the guise of implementing state policy." (ECF Doc. 69, at 20, 21.) Metro misconstrues the holding of that.

*N.C. State Board of Dental Examiners* cannot be read to amend the rule established in *Hallie* that municipalities are exempt from the active supervision requirement. Indeed, the Court in that case explained why active supervision was required by contrasting the subject state agency with municipalities, and in so doing, reaffirmed the no-active-supervision rule for municipalities. *See N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. at 1113. The defining feature of a municipality is that its members are accountable to the public through elections and open records laws. The Supreme Court has determined that these checks, without active state supervision, are sufficient to protect against the potential that elected representatives will exercise the municipality's powers for their own private economic interests. *See id. Accord Cine 42nd St. Theater Corp.*, 790 F.2d at 1047 ("When the actor is a municipality, the active state supervision requirement is abandoned because a municipality has no incentive to act in any other than the public interest.").

Thus, cases decided after *N.C. State Board of Dental Examiners*, including cases cited by Metro, continue to apply the *Hallie* no-active-supervision rule for municipalities. *See Edinboro Coll. Park Apartments*, 850 F.3d at 573; *Chamber of Commerce of the United States of Am. v. City of Seattle*, 890 F.3d 769, 788 (9th Cir. 2018); *AmeriCare MedServices, Inc. v. City of Anaheim*, 735 F.

App'x 473, 474–75 (9th Cir. 2018), *cert. denied sub nom. AmeriCare MedServices, Inc. v. City of Anaheim*, Cal., No. 18-912, 2019 WL 201667 (U.S. Mar. 18, 2019); *Green Sols. Recycling, LLC v. Reno Disposal Co., Inc.*, 359 F. Supp. 3d 960, 972 (D. Nev. 2019).

Metro's attempt to extend the holding of *N.C. State Board of Dental Examiners* to municipalities is fundamentally flawed because it conflates the private economic interests of persons in control of a public entity with the interests of the public entity itself.  Metro focuses on the latter—the notion that the City is itself an active participant in the market "through its corporate subsidiary, RAA."  (*See* ECF Doc. 69, at 22.)[4]  The active supervision requirement, however, is concerned with the former.  The issue is not what the public entity does, but who controls the public entity.  **Active supervision is required if private actors control the public entity, and are personally active in the market the entity regulates.**  *See N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. at 1113.

Assuming *arguendo* that the active supervision requirement could apply to the City, and assuming further that RAA, a public body, could be considered a "private" actor for purposes of active supervision, RAA's alleged efforts to influence the City's regulatory decisions are insufficient to establish that RAA controlled the City in the sense necessary to invoke *N.C. State Board of Dental Examiners*.  At a minimum, Metro would have to allege that RAA's board members constitute a majority of the City's popularly elected City Council.  *See Edinboro Coll. Park Apartments*, 850 F.3d at 582 (holding that the active supervision requirement **might** apply to a public university if the plaintiff could allege that members of the university's non-profit foundation, which was active in the market, constituted a majority of the university's trustees).  Metro cannot allege these facts, because only one of RAA's eleven board members is an elected City official.  Therefore, the City does not

---

[4] Metro's characterization of RAA's relationship to the City conflicts with RAA's enabling statute, enacted by the General Assembly, which states that RAA is a "body politic and corporate of the Commonwealth of Virginia."  *See* 1991 Va. Acts ch. 431 § 4(c).

have to show active supervision to establish state-action immunity, and in turn, neither does RAA.

>    4.    <u>**If it exists, a market participant exception would not apply.**</u>

Metro's "market participant" argument is an effort to make new law. Metro overstates the extent to which authorities have embraced a market participant exception to state-action immunity. Metro selectively quotes from *Omni* to suggest that the Supreme Court embraced a market participant exception, (*see* ECF Doc. 69, at 23), when *Omni* explicitly left open the issue and merely suggested in *dicta* that such an exception might exist. *See Omni*, 499 U.S. at 379 ("We reiterate that, with the **possible** market participant exception, any action that qualifies as state action is *ipso facto* . . . . exempt from the operation of the antitrust laws'") (emphasis added and internal quotations omitted); *accord Phoebe*, 568 U.S. at 226 n.4 (observing that *Omni* left open the question of a market participant exception and declining to address it, because the issue was not raised below). Metro also claims that the Fourth Circuit recognized a market participant exception in *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 768 (4th Cir. 2018), but that case addressed **preemption**, not state-action immunity. There is no controlling authority supporting Metro's claimed market participation exception. For that reason alone, the argument should be rejected. *See Paragould Cablevision, Inc. v. City of Paragould, Ark.*, 930 F.2d 1310, 1312–13 (8th Cir. 1991) (observing that "[a]s yet . . . the market participant exception is merely a suggestion and is not a rule of law" and declining to adopt the exception "[u]ntil such a transformation occurs"); *accord Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 81 (2d Cir. 1998).

The Department of Justice ("DOJ") pleading Metro references reinforces the conclusion that the exception should not be recognized, and also that the rationale for such an exception is not present here. (*See* ECF Doc. 69, at 26.) The DOJ's discussion of market participation differs from Metro's theory in two material ways. First, whereas Metro suggests that market participation

completely negates state-action immunity, in the DOJ's view, market participation merely invokes the active supervision requirement. (*See Seaman v. Duke University, et al.*, Case No. 1:15-cv-462 (M.D.N.C. March 7, 2019), ECF Doc. 325, at 18, ("DOJ Statement").) The DOJ reasons that if a public body controlled by private actors active in the market must show active supervision, it follows that a public body that is itself active in the market must show active supervision. *See id.* at 12, 18.

Like Metro, the DOJ fails to appreciate the distinction between private actors coordinating their private economic interests, which was the concern identified in *N.C. State Board of Dental Examiners*, *see Turner v. Va. Dep't of Med. Assistance Servs.*, 301 F. Supp. 3d 637, 645 (E.D. Va. 2018), and a municipality advancing local public interests, which the Supreme Court in *N.C. State Board of Dental Examiners* confirmed did not pose the kind of danger warranting active state supervision. *See N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. at 1112; *see also Cine 42nd St. Theater Corp.*, 790 F.2d at 1047. Indeed, the municipality in *Hallie* was an active participant in the sewage treatment market, yet the Supreme Court announced the rule that municipalities are not required to show active supervision. *See Hallie*, 471 U.S. at 46–47. *See also Automated Salvage Transp., Inc.*, 155 F.3d at 81. Thus, the market participation exception, if it exists at all, is inapplicable to the City and, in turn, to RAA. *See AmeriCare MedServices, Inc. v. City of Anaheim*, No. 816-cv-1596, 2017 WL 1836354, *10 (C.D. Cal. Mar. 28, 2017) ("The Court declines to recognize a market participant exception here . . . [because] an inquiry into whether a city is acting as a market participant would be in tension with the Supreme Court's holding that a city is entitled to *Parker* immunity so long as there is a state law authorizing anticompetitive conduct in furtherance of a state regulatory scheme").

Second, Metro proposes that the market participant exception must be applied in every circumstance where the public body does not act "purely as a regulator," (*see* ECF Doc. 69, at 11, 20, 26), meaning that the slightest activity that can be characterized as non-"regulatory" lifts the public

body from the protection of state-action immunity. The DOJ version of the test posits that market participation is only relevant when a public body acts "purely as a market participant." (*See* DOJ Statement, at 18.) Under Metro's approach, if the public body acts as both a participant and a regulator, the exception applies, but under the DOJ's approach, it does not. Properly understood, the difference is not a subtle one, and it has significant consequences for the purported exception's application to the alleged conduct. Assuming *arguendo* that the City can be considered a market participant by virtue of RAA's activities, the City is participating through the exercise of its regulatory powers.

The DOJ's narrower approach is consistent with cases in which courts have declined to apply a market participation exception to state-action immunity. *See Wheeler v. Beard*, No. CIV.A. 03-4826, 2005 WL 1217191 (E.D. Pa. May 19, 2005). After acknowledging the exception's uncertain status, the court in *Wheeler* held that if the exception exists, a public entity should not be considered a market participant when its participation is in furtherance of its overarching regulatory authority. *See id.* at *6. Public bodies performing a governmental function in the market, such as EMS vehicle services, usually do so pursuant to an overarching state-sanctioned regulatory regime. *See AmeriCare MedServices, Inc.*, 2017 WL 1836354 at *10; *Buena Vista Estates, Inc. v. Santa Fe Solid Waste Mgmt. Agency*, No. 15-cv-217, 2016 WL 3574170, *8–9 (D.N.M. Mar. 30, 2016). Therefore, Metro's attempt to distinguish cases refusing to apply a purported market participation exception where the public body performs a traditional governmental function is without merit. (*See* ECF Doc. 69, at 26.)

Lastly, the City does not participate in the market. Metro is forced to rely on its theory that the City is a market participant "through its corporate subsidiary, RAA." (*Id.* at 22.) Consistent with the Third Circuit's recent refusal to recognize a market participation exception, "[a]pplying a market-

participant exception to these circumstances would swallow the rule that 'the state does not forfeit *Parker* immunity simply because it acts with a private party.'" *Edinboro Coll. Park Apartments*, 850 F.3d at 582 n.12.

Neither the Supreme Court nor the Fourth Circuit has recognized a market participant exception to state-action immunity, and even if such an exception exists, it does not apply to (i) a municipality (ii) that is not itself participating in the market and (iii) is exercising regulatory authority over a traditional governmental function.  For each of these reasons, Metro's market participation argument against state-action immunity should be rejected.

**B.**    **Metro does not state a claim against RAA for preemption.**

Count III of the Second Amended Complaint alleges that the Competition in Contact Act preempts the City's ordinance requiring a franchise or permit to operate EMS vehicles.  This Count does not state a claim against RAA for three reasons.

First, RAA does not enact, enforce, or regulate the City's ordinances.  Metro also argues that RAA's alleged referral of Lamont Doyle to the City's Office of Chief Administrative Officer and performance of services pursuant to its franchise from the City renders it liable for under Count III. (ECF Doc. 69, at 27; ECF Doc. 49, at ¶¶ 21, 31-33.)  However, this alleged act has no bearing on the validity of the City's ordinance.

Second, the RFQ itself required that, "Before award of a contract, the Service Provider must provide an official City Franchise Permit required to operate patient transport services in the City of Richmond, VA IAW City's Code of Ordinances Sec. 10-78.  '"Operation of Vehicles not holding City Franchise or Permit.'"  (ECF Doc. 60, at Ex. D, p. 16.)  Because the RFQ expressly required compliance with the City's ordinance before an award of the contract, there can be no preemption. Further, as the United States Comptroller General has made clear, conditioning the contract on

Metro's compliance with the City's permit ordinance is a lawful exercise of the VA's discretion. *See In re Lifeline Ambulance Servs., Inc.*, B-277415, 1997 WL 582803 (Comp. Gen. Sept. 22, 1997), attached as Ex. I to ECF Doc. 60.  Metro's attempt to distinguish that opinion simply misses the point.  (ECF Doc. 69, at 28.)

**C.    Metro does not state a claim against RAA for due process violations.[5]**

Count IV of the Second Amended Complaint alleges that Defendants violated Metro's procedural and substantive due process rights.  That Count does not state a claim against RAA for three reasons.

First, even though is no contract, and can be no contract since Metro has not complied with a prerequisite to the award of a contract, Metro—absent citation to authority— argues that the alleged contract with the VA Medical Center is a property right.  (Hr'g Tr. 5:17-7:11, attached as Ex. E to ECF Doc. 60; ECF Doc. 60, at Ex. D, p. 16; ECF Doc. 69, at 30.)  To possess a property interest, a claimant "must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).  As Metro cannot establish more than an unilateral expectation of a contract with the VA Medical Center, it does not have a property interest subject to due process protection.[6]

Second, Metro fails to acknowledge that even if it had a property interest in the alleged contract with the VA Medical Center, it received notice and an opportunity to be heard—via the properly noticed public hearing before the Standing Subcommittee on Public Safety and City Council

---

[5] Metro does not address any of RAA's grounds for dismissing the equal protection claim in Count V.  As such, that Count should be dismissed for the reasons stated in RAA's Brief in Support.
[6] Metro concedes that it has not alleged the existence of a fundamental right and, as such, the substantive due process claim should be dismissed.  (ECF Doc. 69, at 30.)

meeting—which is all the process to which it would be due. *Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir. 2008); ECF Doc. 49, at ¶ 29. Finally, Metro argues, without citation to the Second Amended Complaint, that it has alleged that "RAA worked closely with the city—they had a mutual understanding and worked together in a common plan of preserving RAA's monopoly." (ECF Doc. 69, at 30.) Yet, there are no allegations in the Second Amended Complaint to support a conspiracy to violate constitutional rights. RAA is only alleged to have operated pursuant to its franchise from the City.

**D.    <u>Metro does not state a claim against RAA for a Contracts Clause violation</u>**

Count VI of the Second Amended Complaint alleges that Defendants violated the Contracts Clause by making changes to the City's regulatory scheme to prevent Metro from performing work pursuant to an alleged contract with the VA Medical Center. This Count does not state a claim against RAA for two reasons.

First, as explained *supra*, Metro has not been awarded a contract. Nor could it be awarded a contract since it has not satisfied a prerequisite imposed by the VA Medical Center. Metro does not address the prior admissions that no contract has been awarded. (Hr'g Tr. 5:17-7:11, 7:19-8:10, attached as Ex. E to ECF Doc. 60.)

Second, Metro argues that it has asserted a Contract Clause violation, because the complaint "asserts that: 'The city made changes to its regulatory scheme for the specific purpose to prevent Metro Health from commencing work under the contract.'" (ECF Doc. 69, at 31 (quoting ECF Doc. 49, at ¶ 98).) However, RAA does not enact, enforce, or regulate the City's ordinances, and the VA Medical Center RFQ conditioned the awarding of a contract on the successful bidder obtaining a permit from the City. (ECF Doc. 60, at Ex. D.) Metro addresses neither point.

**E.** **Metro does not state a claim against RAA for tortious interference with contract or business expectancy.**

Count VII of the Second Amended Complaint alleges that Defendants tortiously interfered with Metro's alleged contract with the VA Medical Center. This Count does not state a claim against RAA for two reasons.

First, as explained *supra*, Metro has not been awarded a contract. Nor could it be awarded a contract since it has not satisfied a prerequisite imposed by the VA Medical Center.

Moreover, the Second Amended Complaint does not allege any improper methods on the part of RAA. RAA is alleged only to have performed services pursuant to its franchise from the City. "[W]hen a defendant is 'engaged in the lawful exercise of its statutory and contractual rights, which incidentally may have interfered with the [plaintiff's] private negotiations, [such conduct] is not actionable and will not support recovery for tortious interference with contractual relations.'" *Priority Auto Group, Inc. v. Ford Motor Co.*, 757 F.3d 137, 144 (4th Cir. 2014) (quoting *Charles E. Brauer Co., Inc. v. NationsBank of Virginia, N.A.*, 251 Va. 28, 466 S.E.2d 382, 387 (1996)) (alterations in original).

### III.    CONCLUSION

For all of the foregoing reasons, as well as those set forth in the Brief in Support, Richmond Ambulance Authority, by counsel, respectfully requests that this Court grant its Motion to Dismiss and dismiss the Second Amended Complaint against it with prejudice.

**RICHMOND AMBULANCE
AUTHORITY**

By Counsel

_/s/_ 
David P. Corrigan (VSB No. 26341)
Melissa Y. York (VSB No. 77493)
Counsel for Richmond Ambulance Authority
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
myork@hccw.com

## **C E R T I F I C A T E**

I hereby certify that on the 18th day of April, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Alexander L. Taylor, Jr., Esq.     Wirt P. Marks, IV, Esq.
Alex Taylor Law     City of Richmond
1622 W. Main Street     900 East Broad Street
Richmond, VA 23220     Suite 400
804-239-9232 - Phone     Richmond, VA 23219
866-446-6167 - Fax     804-646-6653 - Fax
alextaylor@alextaylorlaw.com     Wirt.Marks@Richmondgov.com

Eleazer R. Carter, Esq.     Aaron R. Gott
The Carter Law Firm     Bona Law PC
105 South Brooks Street     4275 Executive Square, Suite 200
P.O. Box. 187     La Jolla, CA 92037
Manning, SC 29102     858-964-4589 – Phone
803-435-0550 – Phone     858-964-2301 – Fax
eleazercarter@aol.com     Aaron.gott@bonalawpc.com

/s/ _____
David P. Corrigan (VSB No. 26341)
Melissa Y. York (VSB No. 77493)
Counsel for Richmond Ambulance Authority
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
myork@hccw.com