**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1977

WESTERN STAR HOSPITAL AUTHORITY INC., d/b/a Metro Health EMS,

Plaintiff – Appellant,

v.

CITY OF RICHMOND, VIRGINIA; RICHMOND AMBULANCE AUTHORITY,

Defendants – Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. John A. Gibney, Jr., District Judge. (3:18-cv-00647-JAG)

Argued: December 10, 2020                                    Decided: January 19, 2021

Before MOTZ, THACKER, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Thacker and Judge Quattlebaum joined.

**ARGUED:** Luke Andrew Hasskamp, BONA LAW PC, La Jolla, California, for Appellant. Craig Thomas Merritt, CHRISTIAN & BARTON, LLP, Richmond, Virginia; Wirt Peebles Marks, IV, RICHMOND CITY ATTORNEY'S OFFICE, Richmond, Virginia, for Appellees. **ON BRIEF:** Aaron R. Gott, Jarod M. Bona, BONA LAW PC, La Jolla, California, for Appellant. David P. Corrigan, Melissa Y. York, HARMAN CLAYTOR CORRIGAN & WELLMAN, Glen Allen, Virginia; David B. Lacy, CHRISTIAN & BARTON, LLP, Richmond, Virginia, for Appellees.

DIANA GRIBBON MOTZ, Circuit Judge:

For almost thirty years, the Richmond Ambulance Authority ("RAA"), a public body created by the Commonwealth of Virginia and governed by the City of Richmond ("the City"), has provided nonemergency medical transportation services to the Hunter Holmes McGuire Veteran's Administration Medical Center ("the VA Medical Center"). In 2018, however, the VA Medical Center requested quotes from other service providers. One quote came from Western Star Hospital Authority, Inc., doing business as Metro Health EMS ("Metro Health"). The VA Medical Center selected Metro Health's bid on the condition that Metro Health could obtain a permit from the City to operate emergency medical services ("EMS") vehicles. When the City refused to grant Metro Health a permit, it brought this action against the City and the RAA, alleging violations of the Sherman Antitrust Act and the Supremacy Clause of the United States Constitution. The district court dismissed the case with prejudice, concluding that the defendants enjoy immunity from federal antitrust liability and that federal law does not preempt their actions. We agree and so affirm.

I.

Like many municipalities, the City operates its EMS system through a public utility model. Under this model, the City contracts with a single provider to manage *all* EMS vehicle operations in the City. This ensures that the City's EMS system does not neglect costly, but essential emergency response services in favor of more profitable nonemergency services. Critically, however, the economic feasibility of the public utility

model depends on the EMS provider's exclusivity in the marketplace. This is so because revenues generated by profitable, nonemergency transports are needed to offset the cost of providing emergency services to all, including those without health insurance.

In Richmond, this model owes its existence and governance to two state laws. First, in 1979, the Virginia General Assembly passed a statute granting "governing bodies" of municipalities wide berth to regulate EMS vehicle services. Va. Code Ann. § 32.1-111.14. Such "governing bodies" are empowered to: prohibit the operation of EMS vehicles without a city-issued franchise, license, or permit; limit the number of EMS vehicles allowed to operate in the city; fix the charges for EMS vehicle services; and establish other necessary regulations relating to the operation of EMS vehicles. *Id.* § 32.1-111.14(A). The legislature stated that these powers were "necessary to assure the provision of adequate and continuing emergency medical services and to preserve, protect and promote the public health, safety and general welfare." *Id.* § 32.1-111.14.

Subsequently, in 1991, the General Assembly enacted the Richmond Ambulance Authority Act, creating the RAA as a "public instrumentality exercising public and essential governmental functions." 1991 Va. Acts 645. The legislature granted the RAA authority to "[p]rovide emergency ambulance service originating in the City," as well as "nonemergency service within the Commonwealth." *Id.* This act further provided that the RAA be governed by eleven members: the Richmond City Manager, the Richmond Director of Finance, and nine persons appointed by the Richmond City Council for two-year terms. *Id.* The Richmond City Council subsequently organized the RAA and granted it an indefinite franchise to operate EMS vehicles in the City.

Since its inception in 1991, the RAA has held the City's sole EMS vehicle franchise. Thus, the RAA has provided all services in the City that utilize EMS vehicles, including nonemergency interfacility medical transport services for VA Medical Center patients. In 2018, the VA Medical Center considered contracting with other service providers and opened a bidding process to receive competing quotes. In its request for quotes, the VA Medical Center conditioned any resulting contract on "conformance with . . . all applicable Federal, State and Local laws," and specified that "[b]efore award of a contract, the Service Provider must provide an official City Franchise Permit required to operate patient transport services in the City of Richmond." J.A. 249, 252. Notwithstanding its lack of the necessary permit, Metro Health submitted a bid.

In June 2018, the VA Medical Center conditionally selected Metro Health's bid but simultaneously reiterated that no contract would result unless Metro Health first obtained a permit from the City. Metro Health pressed the City to create a process for entertaining permit applications from private firms. In response, the City posted a permit application on the Richmond Fire Department website. Metro Health perceived the application as unfair and deliberately engineered to prevent it from obtaining a permit. Accordingly, rather than submitting an application, Metro Health immediately filed this suit, seeking a temporary restraining order to prevent interference with its prospective contract. After a hearing, the district court stayed the litigation so that Metro Health could apply for a permit and receive a determination from the City.

Metro Health did so and the Richmond Fire Department initially recommended that Metro Health be granted a permit. But the City Council disagreed; indeed, the Council

voted unanimously to strike a proposed ordinance that would have granted Metro Health a permit.

Metro Health then filed an amended complaint against the City and the RAA, alleging numerous violations of federal and state law. The district court granted the defendants' motion to dismiss, concluding, in relevant part, that the state action immunity doctrine shields the City and the RAA from federal antitrust liability and that their conduct does not offend the Supremacy Clause. Metro Health timely noted this appeal. We review the district court's dismissal of Metro Health's complaint de novo, accepting all well-pleaded allegations as true and construing the facts in the light most favorable to Metro Health. *In re Willis Towers Watson PLC Proxy Litig.*, 937 F.3d 297, 302 (4th Cir. 2019).

II.

Metro Health primarily contends that the City and the RAA have run afoul of the Sherman Act prohibition on monopolization and attempted monopolization. *See* 15 U.S.C. § 2. If, as the defendants assert and the district court found, the state action immunity doctrine shields them from federal antitrust liability, Metro Health cannot succeed on these claims.

Under the state action immunity, or *Parker*, doctrine, federal antitrust laws do "not apply to anticompetitive restraints imposed by the States 'as an act of government.'" *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 370 (1991) (quoting *Parker v. Brown*, 317 U.S. 341, 352 (1943)). At bottom, the *Parker* doctrine embodies "the federalism principle that the States possess a significant measure of sovereignty under our

Constitution." *Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40, 53 (1982). Thus, sovereign states may "confer exclusive or shared rights to dominate a market, or otherwise limit competition to achieve public objectives." *N.C. State Bd. of Dental Examiners v. F.T.C.*, 574 U.S. 494, 503 (2015) [hereinafter *N.C. Dental*]. Were it otherwise, "federal antitrust law would impose an impermissible burden on the States' power to regulate," strong-arming states into "promoting competition at the expense of other values a State may deem fundamental." *Id.*

"Because municipalities and other political subdivisions are not themselves sovereign," the *Parker* doctrine "does not apply to them directly." *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 225 (2013). Rather, municipalities and "substate governmental entities" are immune from federal antitrust claims only "when they act 'pursuant to state policy to displace competition with regulation or monopoly public service.'" *Id.* (quoting *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 413 (1978)). The Supreme Court has long held that such a state policy must be "clearly articulated and affirmatively expressed." *City of Boulder*, 455 U.S. at 54.

In *Town of Hallie v. City of Eau Claire*, the Court explained just "how clearly a state policy must be articulated for a municipality to be able to establish that its anticompetitive activity constitutes state action." 471 U.S. 34, 40 (1985). There, the Court clarified that state action immunity will lie where anticompetitive activity is the "foreseeable result" of a state policy — that is, where it is "clear that anticompetitive effects logically would result" from a given policy or where a regulatory structure inherently displaces unfettered business freedom. *Id.* at 42. A legislature need not, however, "expressly state in a statute

6

or its legislative history that the legislature intends for the delegated action to have anticompetitive effects." *Id.* at 43.

Here, the City and the RAA easily satisfy *Hallie*'s clear-articulation test. The Virginia legislature has expressly conferred broad authority on local governing bodies to engage in anticompetitive conduct in the EMS vehicle services market. *See* Va. Code Ann. § 32.1-111.14(A). A local government may make it unlawful to operate EMS vehicles without a permit, control the issuance of permits, determine where EMS vehicles can and cannot operate, and fix the prices of EMS vehicle services. *Id.* As one court observed over two decades ago, these provisions "expressly authorize anticompetitive conduct." *Forest Ambulance Serv., Inc. v. Mercy Ambulance of Richmond, Inc.*, 952 F. Supp. 296, 300 (E.D. Va. 1997). Far from granting localities "simple permission to play in a market," *Phoebe Putney*, 568 U.S. at 231 (internal citation omitted), the Virginia statute greenlights regulation and service provision that necessarily supplants unrestrained market competition. In these circumstances, anticompetitive conduct is the "foreseeable result" of the state's policy. *Hallie*, 471 U.S. at 42. Accordingly, the City and the RAA are entitled to state action immunity.

Metro Health offers several arguments in an attempt to avoid this straightforward conclusion. First, Metro Health argues that § 32.1-111.14 only authorizes localities to regulate "emergency medical services," not "non-emergency service[s]" like pre-scheduled interfacility transports. Opening Br. at 25–27. Not so. In fact, multiple provisions of the statute make clear that localities may regulate "emergency medical services vehicles," irrespective of whether the vehicles are engaged in emergency or non-

7

emergency services. *See, e.g.*, Va. Code Ann. § 32.1-111.14(A)(3) (conferring power to limit the number of vehicles that may be operated within the city); § 32.1-111.14(A)(8) (granting power to establish necessary regulations relating to the operation of such vehicles); *see also Forest Ambulance*, 952 F. Supp. at 300 ("It is the vehicle, rather than the use, which is being regulated.").

Second, Metro Health contends that *Phoebe Putney* announced a heightened clear-articulation test that the defendants cannot meet. This argument also fails. To be sure, the *Phoebe Putney* Court warned against applying "the concept of foreseeability from [the] clear-articulation test too loosely." 568 U.S. at 229 (quotation marks omitted). But there, the Court considered a Georgia law that merely granted hospital authorities "general corporate powers," not "permission to use those powers anticompetitively." *Id.* at 220. Here, by contrast, the Virginia General Assembly not only empowered the RAA to provide emergency and nonemergency services, *see* 1991 Va. Acts 644, it also expressly authorized the RAA to fix prices and control entry into the EMS vehicle services market, *see* Va. Code Ann. § 32.1-111.14(A). Thus, the defendants' invocation of the *Parker* doctrine fits comfortably within *Phoebe Putney*'s reiteration of *Hallie*'s clear-articulation test. *See Phoebe Putney*, 568 U.S. at 229.

Third, Metro Health maintains that both the City and the RAA must, and cannot, demonstrate that their conduct was "actively supervised by the State." *N.C. Dental*, 574 U.S. at 504 (quoting *Cal. Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980)). But courts only demand this additional showing from "nonsovereign actor[s] controlled by *active market participants*," like "private trade associations vested

8

by States with regulatory authority." *Id.* at 503, 511 (emphasis added). In *N.C. Dental*, for example, the Court required this heightened showing from a state board dominated by active private dentists who, in their role as board members, excluded nondentists from the teeth whitening market. *Id.* at 501.

Municipalities — like the City — and "substate governmental entities" — like the RAA — "are not subject to the 'active state supervision requirement' because they have less of an incentive to pursue their own self-interest under the guise of implementing state policies." *Phoebe Putney*, 568 U.S. at 225–26 (quoting *Hallie*, 471 U.S. at 46–47). As the Supreme Court has long recognized, these entities — unlike private parties — are "exposed to public scrutiny" and "checked" by "the electoral process." *Hallie*, 471 U.S. at 45 n.9. Moreover, as "arm[s] of the State," they are entitled to the presumption "that [they] act[] in the public interest." *Id.* at 45. While Metro Health insinuates that the RAA has improperly "pursue[d] its own interests" by adhering to the City's public utility model, Opening Br. at 35, it provides no evidence that the RAA is involved in "a private price-fixing arrangement," *Midcal*, 445 U.S. at 106, or that its actions are motivated by anything other than "governmental interests," *Hallie*, 471 U.S. at 47. Thus, the concerns that animate the active state supervision requirement are wholly absent from this case.

Finally, in a last-ditch attempt to thwart the defendants' invocation of the *Parker* doctrine, Metro Health proposes that we adopt a novel "market participant" exception to state action immunity. The Supreme Court has never recognized such an exception; in fact, it has suggested only that it might possibly exist. *See Omni*, 499 U.S. at 379 ("We reiterate that, with the *possible* market participant exception, any action that qualifies as

state action is *ipso facto* [] exempt from the operation of the antitrust laws.") (emphasis added); *see also Phoebe Putney*, 568 U.S. at 226 n.4 (explicitly declining to consider whether a market participant exception exists). Nor have *any* of the Courts of Appeals ever concluded that this proposed exception frustrates the invocation of state action immunity, though some have noted that it would, if recognized, introduce considerable tension into federal antitrust law. *See, e.g.*, *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 81 (2d Cir. 1998). Indeed, as Metro Health's counsel conceded at oral argument, the municipality at issue in the seminal *Hallie* case successfully invoked the *Parker* doctrine notwithstanding its status as a "market participant." *See* Oral Arg. at 5:21–6:12. Given this unmistakable friction with longstanding Supreme Court precedent, we decline Metro Health's invitation to steer federal antitrust law into uncharted waters.

Accordingly, we conclude that the City and the RAA acted pursuant to a clearly articulated state policy and are therefore entitled to immunity from federal antitrust liability.

### III.

Metro Health also contends that by "thwart[ing] the [VA Medical Center's] competitive bidding process," Opening Br. at 44, the City and the RAA have violated the Supremacy Clause. In Metro Health's telling, the defendants' conduct conflicted with the Competition in Contracting Act ("CICA"), 41 U.S.C. § 3301(a), which provides that "an executive agency in conducting a procurement for property or services shall obtain full and

open competition through the use of competitive procedures." We must reject this argument.

The Supremacy Clause renders federal law "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Federal law may preempt state law in three ways: by "express preemption," "field preemption," and "conflict preemption." *H & R Block E. Enterprises, Inc. v. Raskin*, 591 F.3d 718, 722 (4th Cir. 2010). For its contention that the CICA preempts defendants' conduct, Metro Health invokes "conflict preemption," which can occur when "'state law stands as an obstacle to the accomplishment of the full purposes and objectives' of federal law." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191–92 (4th Cir. 2007) (quoting *Worm v. Am. Cyanamid Co.*, 970 F.2d 1301, 1305 (4th Cir. 1992)). But here, state law posed no obstacle at all.

Rather, as the VA Medical Center repeatedly made clear — both when it initially requested quotes and when it conditionally selected Metro Health's bid — there would be no contract unless Metro Health first obtained a permit from the City. In an almost identical situation, the U.S. Comptroller General determined that "[e]ven under [CICA's] full and open competition standard," the VA Medical Center may require a vendor to obtain "a franchise or permit from the City of Richmond granting authority to provide emergency ambulance services." *Lifeline Ambulance Servs., Inc.*, B-277415, 97-2 CPD ¶ 83 (Comp. Gen. Sept. 22, 1997); *see also Pac. Legal Found. v. Goyan*, 664 F.2d 1221, 1227 (4th Cir. 1981) (noting that "[t]he opinion of the Comptroller General is . . . entitled to weight as he is the auditing agent of Congress"). The Comptroller General reasoned that "the requirement is necessary to ensure timely performance of the emergency ambulance

11

services by precluding the possibility that the services will be interrupted by the city's enforcement attempts against an unlicensed contractor." *Lifeline Ambulance Servs.*, 97-2 CPD ¶ 83. Where, as here, a federal agency, of its own volition, imposes a contract condition consistent with federal law, the Supremacy Clause is not implicated.

IV.

For these reasons, the judgment of the district court is

*AFFIRMED*.